# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. IROKO PHILLIPS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-05081     James C. Beasley, Jr., Judge**

---

**No. W2010-01605-CCA-R3-CD  - Filed July 13, 2011**

---

A Shelby County jury convicted the Defendant, Iroko Phillips, of one count of aggravated kidnapping and two counts of attempted aggravated rape.  The trial court merged the two counts of attempted aggravated rape and imposed on the Defendant as a Range III, Persistent Offender an effective sentence of sixty years in the Tennessee Department of Correction. On appeal, the Defendant contends the evidence is insufficient to support his convictions and that his convictions violate due process principles.  Having thoroughly reviewed the record and relevant authorities, we conclude the evidence is sufficient to support the Defendant's convictions and that his convictions do not violate his due process rights.  As such, the trial court's judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Michael Johnson (at trial), Memphis, Tennessee, and Tony N. Brayton (on appeal), Memphis, Tennessee, for the Appellant, Iroko Phillips.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Damon Griffin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's violently subduing and attempting to rape a female jogger in her front yard.  Based on this conduct, a Shelby County grand jury indicted

the Defendant for two counts of attempted aggravated rape and two counts of aggravated kidnapping.

At the Defendant's trial, the following evidence was presented: B.C.[1], the victim in this case, testified that she was forty-one on March 17, 2008, the day the attack took place, and that she had only recently moved into her Memphis neighborhood. Around 5:30 p.m. on the evening of the attack, the victim put on jogging clothes, went outside, and began walking down her street in order to warm up for a jog.

As the victim walked down her street, she saw a man she identified in court as the Defendant walking near her. At this point, the victim and the Defendant did not exchange words. As the victim continued her walk, however, she encountered the Defendant again, and, this time, because she was new to the neighborhood, she asked him whether he lived in the area. The Defendant responded vaguely that he lived down the street and asked the victim whether she had a boyfriend. The victim told the Defendant that she did not have a boyfriend but that, as a Jehovah's Witness, she "wasn't interested" and was "mainly there to take [her] walk." The victim asked the Defendant why he was in the neighborhood, and he told her that he was waiting for a friend who worked "around the corner" to get off from work. When the victim again asked the Defendant where he lived, he responded vaguely again, saying he lived "back around K-Mart," refusing to name the street he lived on.

The Defendant's vague answers made the victim nervous, so she decided to return to her house. She said to the Defendant, "Well, you go on and find your friend and I am going to continue my jogging." The victim then began jogging back to her house, hoping to reach it before the Defendant. When she glanced behind shortly after she began jogging, she saw that the Defendant was quickly coming up behind her. The victim realized she would not be able to reach, unlock, and enter her house out of the Defendant's view. In order to avoid showing the Defendant her home, before the victim reached her house, she sat on a tree stump located in a neighbor's yard. When she sat down, the Defendant also stopped and remained in the general area. The victim sat on the stump for a few minutes, hoping that a neighbor would emerge and extricate her from a situation that she had a "really, really bad gut feeling . . . wasn't going to end well."

After no one appeared to help her after a few minutes, the victim stood up and continued walking down the street, this time passing her house on the left without stopping. The Defendant continued to follow her and gradually began walking alongside her as before. The victim walked a little farther until she reached the home of a woman she knew to have dogs. When she reached this house and saw neither the woman nor her dogs, the victim

---

[1]In an effort to protect the privacy of the victim, we will refer to her by her initials only.

realized she had no choice but to try to go back to her house because daylight would not last much longer. She turned around, and, when she reached her yard, she stepped onto her driveway, intending to cut across her yard and make a "mad dash" to her front door of her house, which was set back considerably from the street.

The victim testified that as she took her first step onto her driveway, she felt the Defendant grab her from behind and put her into a headlock. Because the Defendant's arm was wrapped tightly around her neck, the victim was unable to breath, and she dropped to her knees. At this point, the victim remembered she was carrying her keys, so she reached for her largest key and began blindly jabbing at the Defendant's face, hoping to stab him in the eye and induce him to release her. She met with some success in so doing, because the Defendant released her from the headlock. The two continued to struggle, however, and the Defendant repeatedly beat her face with his closed fist. He also kicked her. Blood from her head wounds quickly began to blur her view. She recalled that her only hope was to "keep fighting . . . him off . . . to stay alive." During the struggle, the victim briefly freed herself, and she ran a few steps toward the street. The Defendant quickly reached her again, grabbed her ponytail, and pulled her by her ponytail back away from the street, toward a trash receptacle located farther away from her street, along the high shrubs lining her yard. As he pulled her away, he commanded her to "[g]et up and walk to the back of the house." Realizing no one would ever find her if she allowed him to take her into the wooded area behind her house, she continued to struggle toward the street. As they struggled, the victim felt the Defendant rip away her shoes and jogging pants.

The victim stated that as the Defendant continued to drag her to the trash can near the shrubs, he cursed at the victim, repeating his command to get up and walk to the back of the house. Unable to induce the victim to walk to the backyard, the Defendant dragged her to the trash can. As the victim lay on her back by the trash can, she realized that the Defendant had at some point ripped off her underwear. The Defendant grabbed the victim's knees and tried to pry her legs apart. The victim soon felt something touch her unclothed buttocks, and she began kicking the Defendant because she "knew that that wasn't a good thing." The victim was unable to see what exactly was touching her buttocks because her eyes were covered in blood.

The victim testified that, while the Defendant tried to pry her legs apart, the victim was aware that he was also trying to pull something from the trash receptacle. The Defendant eventually was able to wrest a long strip of black plastic from the trash can, which the victim recognized as a strip of plastic lining from a mirror she had recently disposed of. The Defendant repeatedly beat the victim's body with the plastic strip, only stopping when the strip shattered due to the force he used to thrash the victim. The Defendant took a piece of the broken strip and wielded it while he crouched between her legs. The victim testified that

3

she believed the Defendant intended to sodomize her with the plastic strip. She continued to vigorously kick at the Defendant and, finally, was able to break free. She ran to her next-door neighbor's front porch, wearing only her T-shirt, the Defendant apparently having removed her bra during the struggle. At this point, the victim's face was completely covered in blood. She began banging on her neighbor's front door and screaming, and eventually her neighbor emerged from a side door, saw the victim's state, and brought her in to safety. The victim's torn and bloodied pants, underwear, and sports bra were all later recovered from her yard and her neighbor's porch.

The victim testified that she was taken to a hospital, where she was determined to have sustained a broken nose, two bloodied eyes, and a broken jaw. Her jaw was wired shut for four months. The victim stayed in the hospital one week and incurred $96,000 in medical expenses as a result of the attack. The victim, who cared for the elderly for a living, stated that she was unable to work for the year following the attack.

The victim testified that police visited her while she remained in the hospital and presented her with a photographic line-up of suspects in this case, from which she identified the Defendant as her attacker. She testified that she was easily able to identify the Defendant because she was able to observe him for approximately one hour, the time that lapsed between when she initially emerged from her house to when she escaped from the Defendant to her neighbor's porch. Also, she remembered that her attacker was cross-eyed.

At trial, the victim identified a brown jogging suit and white T-shirt introduced by the State as that which the Defendant wore during the attack.

On cross-examination, the victim recalled that the Defendant had already broken her jaw by the time he dragged her to the trash can. She recalled that, when the Defendant grabbed her by the ponytail, he knocked her off her feet and dragged her by the ponytail to the trash can, with the side of her body dragging along the ground. The victim explained that Jana Smith's home was on one side of her house and that the other side of her house was flanked by trees, with no house within sight.

Amanda Walker, an employee of Lutheran Village, testified that on March 17, 2008, the day of the attack in this case, she took the bus to work. While waiting for the bus, the Defendant walked by her where she was seated at the bus stop and asked whether she had a boyfriend. She replied that she did not, and the Defendant asked whether she wanted him to be her boyfriend. Walker responded that she did and gave the Defendant her cell phone number. Later, when the bus came, she and the Defendant got on the bus. The two did not sit together or speak again on the bus, and Walker got off at her stop twenty minutes later. Walker did not see the Defendant get off the bus. When Walker reached Lutheran Village,

however, she heard a man's voice behind her ask whether he could use the restroom. She turned around and found the Defendant. She told the Defendant that only employees and residents could use the bathroom, and she warned the Defendant that the entire area was under video surveillance. The Defendant turned and left.

Later in the day, when Walker was on a break around 2:30 p.m., the Defendant called her cell phone and asked whether she could leave work. Walker responded that she could not and ended the conversation. Walker did not hear from the Defendant again until he called her several days later from jail. Police interviewed Walker about her interaction with the Defendant. She identified the Defendant as the man who followed her to work at Lutheran Village from a photographic line-up of suspects. Walker stated that testifying against the Defendant was frightening.

Diane Boling confirmed that she lived with her husband and children in the house beside Lutheran Village and that her home was "catty-cornered" from the victim's home. Boling was not acquainted with the victim before the attack, though she had noticed the victim outside her home before. Boling recalled that, on the evening of the attack, she and her husband rode their motorcycle to a local grocery store. On the way to the grocery store, they saw a man Boling identified at trial as the Defendant walking down their street, drinking a beer. When they returned a short time later, they found the victim seated on a tree stump in their front yard, speaking with the Defendant. Boling and her husband found the exchange going on in their front yard strange; however, because the pair were not "hurting anything," they went inside their home without inquiring further.

A short time later, Boling's husband went outside to speak with their landlord. Boling walked outside shortly after her husband and, when she did so, heard the victim screaming. She looked up and saw the victim lying on the ground in her own yard, struggling with the Defendant. Boling immediately alerted her husband to the situation, and he ran up to the street, grabbing a hammer from his truck, which was parked in the driveway. Her husband then began waving the hammer and screaming at the Defendant, while using his free hand to call 9-1-1 on his cell phone.

Boling said she started to go to the victim's yard, but her husband told her to stay back, explaining that the Defendant could be armed. The two continued to stand at the edge of the street and scream at the Defendant to leave the victim alone. The Defendant looked up at the Bolings, appearing to have heard them, then turned back to the victim and began to drag her farther away from the street, toward the back of her house. This alarmed Boling's husband, who took several more steps toward the victim's house, continuing to yell at the Defendant. From where they stood, the Bolings then witnessed the Defendant stand over the victim and repeatedly kick the victim in her head and stomach. At one point, Boling saw the Defendant

5

beat the victim with what appeared to be a "black belt." Boling said the Defendant "just kept swinging up and down." Boling's husband used his cell phone to call the police as they continued to scream at the Defendant to stop. The Defendant finally let go of the victim and walked back toward the street. He turned down the street and walked away from the Bolings's house and toward a nearby intersection.

Boling confirmed that when police later presented her with a photographic spreadsheet of individuals suspected of attacking the victim, she identified the Defendant as the perpetrator. She acknowledged, however, that, when she was asked to identify the perpetrator from a group of eight men at a preliminary hearing in this case, she did not identify the Defendant because she was too frightened.

Jana Smith, the victim's next door neighbor, testified that nothing appeared to be amiss when she saw the victim walking down their street sometime between 6:00 p.m. and 6:30 p.m. on the day of the attack. Just after Smith finished eating dinner with her family on the day of the attack, she heard a loud banging on the front door. When she reached the front door, which had no windows or peep holes, she heard a voice say, "[H]elp, I've been attacked, I've been attacked!" She ran out the side door of her house and around to the front where she found the victim, bleeding and unclothed from the waist down. She said that the victim, who was jumping up and down on the porch, appeared to be in a high state of anxiety. Smith ran quickly back into her house and grabbed a blanket, returned to the porch, and covered the victim with the blanket. As soon as she did so, the victim collapsed onto the porch.

Officers from the Memphis Police Department collected gray shorts, a blood-stained gray shirt, a sports bra, a towel, a strip of black plastic, and a "Black and Mild" cigar from the victim's front yard. Lieutenant Angela Smith, a sex crimes unit police officer, obtained a description of the assailant from the victim. In the course of her investigation, Lt. Smith discovered that a security camera from Lutheran Village had taped the entire encounter between the Defendant and the victim. On the video, which is partially focused on the victim's house, the victim can be seen emerging from her house around 6:42. A man meeting the victim's description of her attacker can be seen in the same frame, following the victim from a short distance. Within about five minutes, the man can be seen walking alongside the victim, and the two briefly stop, and continue walking down the street, out of view of the camera. Several minutes later, the victim and her attacker come back into view of the camera, walking back toward the victim's home. The video showed that, at 7:17 p.m., the man attacked the victim in her front yard. The two struggled, with the victim lying on the ground. After the victim tried to get away, the man moved the victim from the front yard to the side of her house. The man soon released the victim and walked away.

Several days after the attack, the Defendant voluntarily came to Lt. Smith's precinct

in connection with an unrelated incident. Lt. Smith recognized the Defendant as the man shown in the Lutheran Village tape attacking the victim. The Defendant agreed to give a statement to police regarding the victim's attack. He told police that Alice Walker had allowed him to fondle her on a city bus and that, hoping to meet her again, he waited for Walker to get off from where she worked on the Defendant's street. He told police he waited for Walker near an apartment complex in the vicinity until about 8:00 p.m. The Defendant said he was wearing a light brown and dark brown jogging suit with a white T-shirt and white tennis shoes at this time. He confirmed that he was carrying a beer and smoking "black and mild" cigars while he walked around the area, waiting for Walker. The Defendant denied attacking the victim. Although he had a scrape on the back of his neck, the Defendant insisted the scrape came from "wrestling and playing" with his girlfriend. Lt. Smith contacted the Defendant's girlfriend who agreed to allow Lt. Smith to search her home. The lieutenant retrieved two white T-shirts and a beige and brown jogging suit from the home.

The Defendant testified at trial that he had never met, much less attacked, the victim. Although the Defendant acknowledged that he followed Walker to work, he denied that he remained in the area, waiting for her to get off work. The Defendant confirmed that he had a beer, a towel, and a cigar with him when he followed Walker to work. During trial, the Defendant insisted on being addressed as "Bob Marley," and he told the court that his birth date was February 6, 1945, whereas the Defendant's actual birth date is June 16, 1978. The Defendant denied giving a statement to Lt. Smith about the attack in this case, explaining that he would never have spoken with a female officer.

At the conclusion of trial, the jury convicted the Defendant of two counts of attempted aggravated rape and one count of aggravated kidnapping. At sentencing, the trial court merged the two counts of attempted aggravated rape. The trial court sentenced the Defendant as a Range III, Persistent Offender to thirty years for his aggravated kidnapping conviction and to thirty years for his attempted aggravated rape conviction. The trial court imposed consecutive sentencing, which resulted in a total sentence of sixty years for the Defendant. The Defendant filed a timely motion for new trial. The trial court denied the Defendant's motion for new trial, and this timely appeal followed.

## II. Analysis

On appeal, the Defendant contends that the evidence was insufficient to support his convictions and that his dual convictions for aggravated kidnapping and attempted aggravated rape violate the due process clause of the United States Constitution and the law of the land clause of the Tennessee Constitution.

### A. Due Process Protection

The Defendant contends his convictions for aggravated kidnapping and attempted aggravated rape violates due process principles, particularly as the Tennessee Supreme Court interpreted these principles in *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997). He argues due process principles preclude his dual convictions for aggravated kidnapping and attempted aggravated rape because his "movement or confinement" of the victim did not go beyond that necessary to commit the attempted aggravated rape. Acknowledging that he waived this issue by failing to raise it in a motion for new trial, he contends he is nonetheless entitled to relief because his dual convictions constitute plain error. The State responds that the Defendant's dual convictions for aggravated kidnapping and attempted aggravated rape do not violate due process guarantees and, thus, do not constitute plain error.

As the Defendant acknowledges, he has waived the issue of whether his dual convictions violate due process by failing to raise the issue in his motion for new trial. *See* Tenn. R. App. P. 3(e); *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1984). However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for new trial . . . ." Tenn. R. App. P. 36(b). We refer to this discretionary consideration of waived issues as "plain error" review. *See Grindstaff v. State*, 297 S.W.3d 208, 219 n. 12 (Tenn. 2009).

In light of the lengthy sentence the Defendant received as a result of being convicted of both aggravated kidnapping and attempted aggravated rape, we conclude that review of the issue is "necessary to do substantial justice." *See* Tenn. R. App. P. 36(b). Thus, we elect to determine whether plain error is present.

This Court will grant "plain error" pursuant to Rule 36(b) only where the following five criteria are met: (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "'probably changed the outcome of the trial.'" *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id*. at 283. The party claiming plain error has the burden of persuading the appellate court. *Banks*, 271 S.W.3d at 119.

Whether a felony conviction and an accompanying kidnapping conviction violate principles of due process is a question of law initially determined by the trial court. *State v.*

*Fuller*, 172 S.W.3d 533, 535 (Tenn. 2005) (citing *State v. Cozart*, 54 S.W.3d 242, 247 (Tenn. 2001)). Thus, review of such a determination is de novo with no presumption of correctness. *Griffin v. State*, 182 S.W.3d 795, 798 (Tenn. 2006).

In *State v. Anthony*, our Supreme Court recognized that certain crimes, such as robbery and rape, necessarily involve some detention or confinement of the victim. 817 S.W.2d 299, 306 (Tenn. 1991). The Court held that, under circumstances in which the detention or confinement of the victim is "essentially incidental" to the underlying felony, principles of due process prohibit the imposition of another conviction for kidnapping. *Id*. In *State v. Dixon*, the Tennessee Supreme Court set out a two-part test for analyzing whether a defendant's detention or confinement of a victim is "essentially incidental" to an underlying felony. 857 S.W.2d 532, 535 (Tenn. 1997). Under the first part of the *Dixon* test, a court must make a threshold determination of whether "the confinement or movement was beyond that necessary to consummate the [felonious] act . . . ." *Id*. If a defendant's conduct passes this threshold, then due process principles allow for a separate kidnapping conviction if the conduct also either "(1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id*.

As to the first prong of the *Dixon* test, the Defendant chiefly argues that, because his movement of the victim was "relatively slight and came in the context of the victim's efforts to escape," this additional "movement or confinement" of the victim was not beyond that necessary to complete the attempted rape. He further argues that *Dixon*'s second prong is not satisfied. He contends that, because he dragged the victim only a short distance and kept her beside the trash can for only a short time, in plain sight of neighbors, the additional movement did not create "a significant danger or increased risk of harm to the victim."

The State responds first that the Defendant's additional act of dragging the victim to the trash can was not necessary to commit the attempted aggravated rape because the Defendant could have completed the attempted aggravated rape in her front yard, where he initially subdued her by striking her with his hands and feet. It argues that, because the Defendant moved the victim only in order to "augment" the force of his attack by finding a new weapon in the trash can, this additional activity was unnecessary to the attempted aggravated rape and satisfies the first prong of *Dixon*. The State argues the second prong of *Dixon* is met because the act of dragging the victim to the trash can, where the Defendant retrieved a plastic strip and used it to beat the victim, "created a significant danger or increased the victim's risk of harm." *See Dixon*, 957 S.W.2d at 535.

The facts of this case are strikingly similar to the facts of *Dixon*. In *Dixon*, the defendant grabbed the victim and pinned her to the ground. *Id*. The defendant then dragged the victim thirty or so feet off of the lighted sidewalk and behind some nearby shrubbery. *Id*.

9

The defendant beat the victim and then sexually assaulted her.  *Id*.  The Supreme Court held that the kidnapping, assault, and sexual battery offenses were separate offenses, not subject to merger under *Anthony*.  *Id*.  The Court explained that the brutal beating of the victim was clearly separate from the other offenses.  *Id*.  Further, the Court explained that when the defendant moved the victim the thirty or so feet in order to lessen his chances of detection, this was separate from and, thus, not "essentially incidental" to, the sexual battery.  *Id*. Therefore, the Court concluded, the aggravated kidnapping, aggravated assault, and sexual battery convictions did not merge.  *Id*. at 535.

As in *Dixon*, the facts of this case do not suggest that the kidnapping was "necessary" in order to rape the victim.  While the Defendant was choking and striking the victim, he began ripping away her clothing.  As the Defendant continued to strike the victim, a neighbor who had noticed the commotion screamed a warning at the Defendant and waved a hammer in the air.  This warning prompted the Defendant to drag the victim away to a location farther from public view.   Because the Defendant had already exercised physical control over the partially unclothed victim before he moved her around the house, he could have raped the victim without moving her away from the street.  Thus, this additional movement was "beyond that necessary to consummate" the victim's rape.  *See Dixon*, 857 S.W.2d  at 535. As such, his unlawful confinement of the victim passes the threshold *Dixon* requirement of being unnecessary to commit the accompanying felonious act.

As to *Dixon*'s second part, the strongest legitimate inference one can draw from the record is that Mr. Boling's screaming and waving a hammer at the Defendant caused the Defendant to drag the victim away from the front yard.  In our view, this evidence makes plain the Defendant's intent to "lessen his risk of detection" by moving the victim to the trash can. *See id*.  The victim's ultimate success in escaping from the Defendant does not diminish the criminality of the Defendant's choice to forcibly move the victim to the trash can.

Further, the record is clear that, after being moved to the trash can, the victim suffered numerous additional injuries to her face and legs as a result of being repeatedly whipped with the plastic strip the Defendant retrieved from the trash receptacle.  Thus, the victim's transfer to the trash can increased not only her *risk* of harm but also the actual harm that befell her. *Id*.  Also, in light of the victim's testimony that the Defendant brushed her unclothed buttocks with a strip of plastic, by moving to the trash can the Defendant gained access to a number of objects with which to vaginally penetrate, sodomize or strike the victim, thereby "increas[ing] the victim's risk of harm."  *Id*.

In summary, by moving the victim to the trash can, the Defendant did not merely create a danger or increase the victim's risk of harm.  He actually inflicted additional physical injury upon the victim as a result of his moving her around the house to the trash can, where he

severely beat her and began to touch her body with foreign objects retrieved from the trash. Further, one could reasonably infer that the Defendant dragged the victim away from the front yard in order to avoid public view, specifically Mr. Boling's view. Thus, the Defendant's conduct also lessened his "risk of detection." *See id*. Because the Defendant's conduct, which was "beyond that necessary" to consummate the victim's rape, both resulted in additional injury to the victim and was calculated to avoid detection of the attack, we conclude that it was not "essentially incidental" to the attempted aggravated rape of the victim. *See Anthony*, 817 S.W.2d at 306. As such, the Defendant's dual convictions for aggravated kidnapping and attempted aggravated rape do not violate due process principles. Because the Defendant's dual convictions breached no "clear and unequivocal rule of law," entry of these judgments was not "plain error." *See Smith*, 24 S.W.3d at 282-83. He is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant contends the evidence was insufficient to support his convictions for aggravated kidnapping and two counts of attempted aggravated rape. Specifically, he argues: (1) that the evidence was insufficient to establish his identity as the victim's assailant; (2) that the evidence did not show he took a "substantial step" toward sexually penetrating the victim and, therefore, did not support his conviction for attempted aggravated rape; and (3) that the evidence did not prove beyond a reasonable doubt that he committed aggravated kidnapping. Additionally, the Defendant renews his due process objection to his convictions, arguing that the evidence was insufficient as a matter of law to support his convictions for aggravated kidnapping and attempted aggravated rape. We have already addressed and rejected the Defendant's due process argument.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations

omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Identity

The Defendant argues first that the evidence did not establish his identity as the perpetrator of the crimes in this case for the following reasons: because the evidence was "largely based on the testimony of the victim"; the videotape recovered from Lutheran Village is inconclusive as to the perpetrator's identity; the jogging suit recovered from the Defendant's girlfriend's house was not bloody; and the Defendant bore no significant scratch marks when he was interviewed by police four days after the attack.

The State responds that the victim's identification alone supports the Defendant's

identity as the perpetrator, noting that the victim spent a substantial amount of time conversing with the Defendant in broad daylight before he attacked her. The State notes also that Amanda Walker identified the Defendant as the man who, earlier on the day of the victim's attack, followed her to Lutheran Village, a complex near the victim's home. The State notes also that the surveillance video that recorded the attack shows that the assailant resembled the Defendant.

The identity of the perpetrator is an essential element of any crime, and it, therefore, must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). We would also note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*. Further, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Evans*, 108 S.W.3d at 236. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury.

At the Defendant's trial, the victim identified the Defendant as her assailant. This alone is sufficient to prove the Defendant's identity as her attacker. *See State v. Toomes*, 191 S.W.3d 122, 130 (Tenn. Crim. App. 2005). There was also ample other evidence supporting his identity. Amanda Walker identified the Defendant from a photographic line-up as the man who followed her to Lutheran Village on the day of the attack. Diane Boling, a neighbor who witnessed part of the attack from her front yard, also identified the Defendant as the man she saw attack the victim. According to Lt. Smith, the Defendant was immediately recognizable from the Luthern Village security footage as the man who attacked the victim. This evidence provided a strong basis for the jury to find that the Defendant was the perpetrator of the crimes against the victim. Further, contrary to the Defendant's argument on appeal, when police photographed the Defendant four days after the attack, the Defendant in fact had a scratch mark on the back of his neck. We conclude that the evidence supports the jury's finding that the State proved beyond a reasonable doubt that the Defendant was the assailant in this case. He is not entitled to relief on this issue.

### 2. "Substantial Step" Element of Attempted Aggravated Rape

The Defendant contends that, because the Defendant never explicitly asked the victim for sex or removed his own clothing, the evidence did not establish that the Defendant took a substantial step toward sexually penetrating the victim. The Defendant also argues that the victim's testimony that something brushed her bare buttocks did not show that the Defendant took a substantial step because, as the victim was on the ground, a variety of objects could have come into contact with her buttocks.

The State responds that, because the Defendant asked the victim whether she was single earlier on the evening of the attack, repeatedly tried to force her legs apart after he had removed her pants and underwear, and was wielding a plastic strip when the victim felt something brush her buttocks, the Defendant took a substantial step toward raping the victim.

In this case, the Defendant was convicted of attempted aggravated rape. A conviction for aggravated rape requires proof beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim and either did so through force and coercion, caused bodily injury, or was aided or abetted by another person and used force or coercion. *See* T.C.A. § 39-13-502 (2009). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A.. § 39-13-501.

The Tennessee Code Annotated also provides that:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101. Subdivision (a)(3) applies to the Defendant's conduct. Thus, the State was required to prove that the Defendant's conduct constituted a substantial step toward the commission of aggravated rape and that he acted intending to commit aggravated rape.

14

In *State v. Fowler*, the Tennessee Supreme Court held that a defendant took a "substantial step" toward statutory rape where the defendant delivered payment to an undercover officer for what he believed was a fourteen-year old sexual slave. 3 S.W.3d 910 (Tenn. 1999). The Court explained that, if it required the defendant to engage in conduct beyond the delivery of the payment, it would "create a dangerous precedent by requiring that the defendant take delivery of the boy or actually begin some act that would approach sexual penetration." *Id*. at 912. The Court observed that only the intervention of the undercover officer in halting the transaction and arresting the defendant stopped the defendant from his intended purpose of raping the boy. *Id*. at 911. Where a defendant's actions include physical contact with a victim, the convicting evidence generally "amply supports" the defendant's conviction for attempting a sexual crime. *See*, *e.g.*, *State v. Elkins*, 102 S.W.3d 578, 585 (Tenn. 2003).

In this case, the Defendant had prolonged, violent physical contact with the victim under circumstances that clearly demonstrated that he desired to have sexual intercourse with her. Thus, this case is well within the class of cases where the evidence "amply supports" a conviction for an attempted sexual offense. *See id*. Earlier on the evening of the attack, the Defendant asked the victim whether she was single. Later, after stalking the victim around her neighborhood, the Defendant choked and struck the victim, and began to forcibly remove the victim's clothing, including her underwear. Realizing that he was being observed, and facing increasing resistance from the victim, the Defendant drug the victim away from the public street to a nearby trash can. Beside the trash can, the Defendant repeatedly tried to pry the victim's legs apart. After observing the Defendant pick up a strip of plastic from the trash can, the victim felt something consistent with a piece of plastic brush her buttocks. The strongest legitimate inference one can take from this evidence is that the Defendant formed the intent to sexually penetrate the victim at some point before or at the beginning of her attack and that, when the Defendant beat the victim into submission, ripped her clothing off, pried her legs apart, and jabbed at her buttocks with a plastic strip, he acted with the intent to sexually penetrate the victim. The Defendant did not penetrate the victim because the Bolings intervened in the attack, and the victim was able to fight the Defendant off and escape. These circumstances make clear that the Defendant's "entire course of action" was consistent with an "intent to sexually penetrate the victim." *See* T.C.A. § 39-12-101(b). Consequently, we conclude that the Defendant took a substantial step toward committing aggravated rape. *See* T.C.A. § 39-12-101(a)(3). Accordingly, we conclude the evidence in this case amply supports the jury's finding that the Defendant committed attempted aggravated rape. He is not entitled to relief on this issue.

### 3. Aggravated Kidnapping

The Defendant's final contention is that the evidence was insufficient to support his

15

aggravated kidnapping conviction. He does not specify what the evidence failed to show. Rather, he alleges broadly that the evidence failed to show "beyond a reasonable doubt" that he was guilty of aggravated kidnapping.

The State responds that the evidence sufficiently supports the Defendant's aggravated kidnapping conviction because it shows that the Defendant dragged the victim by her hair in order to move her away from the street, near the trash can. The State argues that the act of dragging the victim by her hair alone shows that the Defendant moved the victim to the trash can against her will.

As relevant to this case, a conviction for aggravated kidnapping may lie where a defendant falsely imprisons a victim, and the victim suffers bodily injury. T.C.A. § 39-13-304 (2009). False imprisonment occurs where a defendant "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a) (2009).

In this case, the Defendant subdued the victim by placing her in a headlock. After the victim was briefly able to free herself from the Defendant's grasp by stabbing the Defendant with her keys, the Defendant again subdued the victim by violently grabbing her by her ponytail. As he did so, he ordered the victim to go with him to the back of her house, but the victim refused, continuing to struggle against him. This prompted the Defendant to use the victim's ponytail to remove her from where they struggled near the street to a more remote area near the side of her house where a trash can was located. While dragging the victim to this area, the side of the victim's body was dragged along the ground. As the victim continued to struggle to get away from the Defendant, he continued to beat and kick her, causing numerous abrasions to her face and body. Once he was able to reach the trash can, the Defendant retrieved a strip of plastic, which he used to beat the victim as she struggled to free herself. The Defendant's use of violent means to move the victim from the front of the yard shows that he was moving the victim against her will. Moreover, the Defendant explicitly requested that the victim go to the back yard, and she refused this request and continued to struggle against the Defendant. Thus, we conclude that the evidence shows that the Defendant "knowing removed [the victim] so as to interfere substantially with [her] liberty." *See* T.C.A. § 39-13-302(a)(4). Further, because the victim suffered abrasions to her face and legs and a broken jaw, requiring a week-long hospital stay, her jaw to be wired shut for four months, and a year to fully recover and return to work, the victim suffered bodily injury as a result of being removed against her will. *See* T.C.A. § 39-13-304. As such, we conclude the evidence proved beyond a reasonable doubt that the Defendant was guilty of aggravated kidnapping. He is not entitled to relief on this issue.

### III. Conclusion

16

After a thorough review of the record and applicable law, we conclude that the evidence was sufficient to support the Defendant's convictions and that his convictions do not raise due process concerns.  Accordingly, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE